*331 ORDER (Granting Plaintiff’s Motion for Summary Judgment)
TODD R. MATHA, Associate Judge».
INTRODUCTION
The Court must determine whether to grant either party’s Motion for Summary Judgment The constitutional provisions in question dictate that a legislator retain his or her designation as Vice President upon assuming and departing the office of President pro tempore. Therefore, the Court grants summary judgment in favor of the plaintiff, and. the legal analyses for this decision follow below.
*332 PROCEDURAL HISTORY
The Court recounts the procedural history of the instant case in significant detail in its Order (Granting Motion to Strike), CV 01-84 (HCN Tr. Ct, Nov. 5, 2001). For purposes of this decision, the Court notes that it notified parties of the Motion Hearing in the September 24, 2001 Scheduling Order. The Court convened the Motion Hearing on November 8, 2001 at 9:30 A.M. CST. The following parties appeared at the Hearing: Attorney Jeffrey S. De-Cora, plaintiffs counsel, and Attorney Aly-sia E. LaCounte, defendants’ counsel.
APPLICABLE LAW
CONSTITUTION OF THE HO-CHUNK NATION
Article V—Legislature
See. 1. Composition of the Legislature.
(c) The Legislature shall select from among its Members a Vice President to serve throughout such Member’s term. The President shall preside over meetings of the Legislature. The Vice President shall preside over meetings of the Legislature in the absence of the President and at such times the Vice President shall retain the power to vote.
Sec. 2. Powers of the Legislature. The Legislature shall have the power:
(b) To establish Executive Departments, and to delegate legislative powers to the Executive branch to be administered by such Departments, in accordance with the law; any Department established by the Legislature shall be administered by the Executive; the Legislature reserves the power to review any action taken by virtue of such delegated power;
(g) To set its own procedures, select its officers, and to enact laws governing attendance of its members, including penalties for absences;
Sec. 6. Terms of Office. Members of the Legislature shall serve four (4) year terms which shall be staggered. Legislators shall represent them respective Districts until them successors have been sworn into office except if the Legislator has been successfully removed or recalled in accordance with this Constitution. Members of the Legislature shall be elected by a majority vote of the eligible voters from their respective Districts.
Article VI—Executive
Sec. 1. Composition of the Executive Branch.
(b) The Executive Branch shall be composed of any administrative Departments created by the Legislature, including a Department of the Treasury, Justice, Administration, Housing, Business, Health and Social Services, Education, Labor, and Personnel, and other Departments deemed necessary by the Legislature. Each Department shall include an Executive Director, a Board of Directors, and necessary employees. The Executive Director of the Department of Justice shall be called the Attorney General of the Ho-Chunk Nation. The Executive Director of the Department of Treasury shall be called the Treasurer of the Ho-Chunk Nation.
Sec. 2. Powers of the President. The President shall have the power:
(d) To administer all Departments, boards, and committees created by the Legislature;
(I) To execute, administer, and enforce the laws of the Ho-Chunk Nation necessary to exercise all powers delegated by the General Council and the *333 Legislature, including but not limited to the foregoing list of powers.
Article VII—Judiciary
Sec. 5. Jurisdiction of the Judiciary.
(a) The Trial Court shall have original jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs and traditions of the Ho-Chunk Nation, including cases in which the Ho-Chunk Nation, or its officials and employees, shall be a party. Any such ease or controversy arising within the jurisdiction of the Ho-Chunk Nation shall be filed in Trial Court before it is filed in any other court. This grant of jurisdiction by the General Council shall not be construed to be a waiver of the Nation’s sovereign immunity.
Section 6. Poivers of the Tribal Court
(a) The Trial Court shall have the power to make findings of fact and conclusions of law. The Trial Court shall have the power to issue all remedies in law and in equity including injunc-tive and declaratory relief and all writs including attachment and mandamus.
(b) The Trial Court shall have the power to declare the laws of the Ho-Chunk Nation void if such laws are not in agreement with this Constitution.
Article IX—Removal, Recall and Vacancies
Sec. 9. Vacancy of the Office of the Pres'id,ent. If the office of the President becomes vacant by reason of death, mental or physical incapacity, removal or recall vote, resignation, felony conviction, or for any other reason, such vacancy shall be filled in the following manner:
(b) If less than twelve (12) months remain before the next General Election, the Vice President shall serve as President pro tempore. If less than twelve (12) months but more than three (3) months remain before the next General Election, the Election Board shall call a Special Election in the appropriate District within thirty (30) days to fill the seat vacated by the Vice President. Upon election of a President at the next General Election, the Vice President shall reassume his seat on the Legislature for the remainder of his term, if any.
.(d) A Vice President serving in the capacity of President pro tempore shall not vote in the Legislature except to cast the deciding vote in case of a tie.
Sec. 10. Vacancies in the Legislature. If a vacancy occurs in the Legislature because of death, mental or physical incapacity, removal or recall vote, resignation, felony conviction, or for any other reason, such vacancy shall be filled in the following manner:
(a) If three (3) months or more remain before the next General Election, the Election Board shall call a Special Election in the appropriate District to be held within thirty (30) days.
(b) If less than three (3) months remains before the next General Election, the seat shall remain vacant, except when the Vice President assumes the office of the President pursuant to Section 9(b) of this Article, an election to fill that vacancy shall be held within thirty (30) days.
Article X—Bill of Rights
Sec. 1. Bill of Mights.
*334 (a) The Ho-Chunk Nation, in exercising its powers of self-government, shall not:
(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;
HO-CHUNK NATION RULES OF CIVIL PROCEDURE
Article VII—Judgements and Orders
Rule 23. Naming Pañíes.
Every action shall be brought in the name of the real party in interest, however, a guardian, trustee or other person in a fiduciary position may sue in his/her own name without joining the party for whose benefit the action is maintained. Matters with minors and incompetents as parties shall be filed using only initials and date(s) of birth.
Rule 24. Substituting, Intervening and Joining Parties.
If a party becomes incompetent or transfers his/her interest or separates from some official capacity, another party may be substituted as justice requires. A party with an interest in an action may intervene and be treated in all respects as a named party to the action. To the greatest extent possible, all persons with an interest will be joined in an action if relief cannot be accorded among the current parties without that person, or the absent person’s ability to protect their interests is impeded unless they are a party. Failure to join a party over whom the Court has no jurisdiction will not require dismissal of an action unless: it would be impossible to reach a just result without the absent party. The Court will determine only the rights or liabilities of those who are a party to the action.
Rule 53. Relief Available.
Except in a Default Judgement, the Court is not limited to the relief requested in the pleading and may give any relief the evidence makes appropriate. The Court may only order such relief to the extent allow[7]ed by Ho-Chunk Nation enactments. The Court may order any party to pay costs, including filing fees, costs of service and discovery, jury and witness costs. Findings of fact and conclusions shall be made by the Court, in support of all final judgements.
Rule 55. Summary Judgement.
Any time after the Answer is due or filed, a party may file a Motion for Summary Judgement on any or all of the issues presented in the action. The Court will render summary judgement in favor of the moving party if there is no genuine issue as to material fact and the moving party is entitled to judgement as a matter of law.
Rule 58. Amendment to or Relief from Judgement or Order.
(A) Relief from Judgement. A Motion to Amend, or for relief from judgement, including a request for a new trial shall be made within ten (10) calendar days of the filing of judgement. The Motion must be based on an error or irregularity which prevented a party from receiving a fair trial or a substantial legal error which affected the outcome of the action.
(B) Motion for Reconsideration. Upon motion of the Court or by motion of a party made not later than ten (10) calendar days after entry of judgement, the Court may amend its findings or conclusions or make additional findings or con- *335 elusions, amending the judgement accordingly. The motion may be made with a motion'for-a-new trial. If the Court amends the judgement, the time for initiating an appeal commences upon entry of the amended judgement. If the Court denies a motion filed under this rule, the time for initiating an appeal from the judgement commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) days after the entry of judgement, the Court does not decide a motion under this Rule or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgement commences in accordance with the Rules of Appellate Procedure.
(C) Erratum Order or Reissuance of Judgement. Clerical errors in a court record, including the Judgement or Order, may be corrected by the Court at any time.
(D) Grounds for Relief. The. Court may grant relief from judgements or order's on motion of a party made within a reasonable time for the following reasons: (1) newly discovered evidence which could not reasonably have been discovered in time to request a new trial; or (2) fraud, misrepresentation or serious misconduct of another party to the action; or (3) good cause if the requesting party was not personally served in accordance with Rule 5(c)(1)(a) or (b); did not have proper service and did not appear in the action; or (4) the judgement has been satisfied, released, discharged or is without effect due to a judgement earlier in time.
Rule 61. Appeal⅜
Any final Judgement or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court. The A/»peal must comply with the Ho-Chunk Nation Rules of Appellate Proceda re, specifically Rules of Appellate Procedure, Rule 7, Right of Appeal. All subsequent actions of a final Judgement or Trial Court Order must follow the HCN Rules of Appellate P roced ure.
FINDINGS OF FACT
The parties stipulated that “no genuine issue as to material fact ...” exists within the instant case, thereby rendering the matter capable of resolution through summary judgment. Ho-Chunk Nation Rules of Civil Procedure [hereinafter HCN R. Civ. P.], Rule 55. The following undisputed facts reflect the mutual understanding of the parties. The Court restates the facts in verbatim form as reported in the October 15, 2001 Stipulated Facts.
1. Mr. Clarence Pettibone was duly elected by the members of Ho-Chunk Nation to serve a four-year term as their Legislator, representing Area I, in the Ho-Chunk Nation General Election held June 1999.
2. The Ho-Chunk Nation Legislature appointed Mr. Pettibone to serve as their Vice President at a duly convened meeting of the Ho-Chunk Nation Legislature held September 2,1999.
3. The minutes of the meeting and all action taken at the meeting of the Ho-Chunk Nation Legislature on September 2, 1999 were approved and ratified at the next meeting of the Ho-Chunk Nation Legislature held on September 9, 1999.
4. The .Ho-Chunk Nation General Council took action on October 21, 2000 to remove the sitting President of the Ho-Chunk;-.Nation: thereby creating a vacancy in the Office of President.
5. As the sitting Vice President, Mr. Pettibone ascended to the position of *336 President Pro Tempore of the Ho-Chunk Nation.
6. Mr. Pettibone’s ascension to the position of President Pro Tempore left the Legislature without a sitting Vice President.
7. The Ho-Chunk Nation Legislature installed Mr. Wade Blaekdeer in the position of Vice President pro tempore on October 24, 2000.
8. Mr. Troy Swallow was elected to the position of President of the Ho-Chunk Nation at the General Election held June 6, 2001 and took office following his swearing-in on July 4, 2001.
9. The Ho-Chunk Nation Legislature approved Resolution 07-08-01 G [hereinafter HCN LEG. RES. 07/08/01 G| on July 3, 2001 purporting to appoint Mr. Wade Blaekdeer to the position of Ho-Chunk Nation Vice President.
10. Mr. Clarence Pettibone has resumed his seat on the Legislature as of July 4, 2001.
11. The Vice President’s duties are established by Code, to wit: the Legislative Establishment Act and the Gaming Establishment Ordinance.
12. The Vice President is paid the same as other legislators.
DECISION
The parties have presented two (2) principal issues within the instant case. Specifically, the Court must resolve whether the plaintiff possesses the requisite standing to bring this cause of action, and, if so, whether the Constitution of the Ho-Chunk Nation [hereinafter Constitution] preserves a Legislator’s designation as Vice President throughout such member’s four-year term. The Court shall address each issue in turn below.
I. Does a Legislator have standing to seek declaratory and other relief from the Court when alleging that a constitutional violation by the Legislature directly impacts said Legislator?
In order to answer this question, the Court needs to review its case law concerning justiciability, particularly in relation to the issue of standing. At the outset, the CONSTITUTION limits the Court’s subject matter jurisdiction to “cases and controversies ... arising under the Constitution, laws, customs and traditions of the Ho-Chunk Nation....” Constitution, Art. VII, § 5(a); see also Ho-Chunk Nation v. Harry Steindorf et al., CV 99-82 (HCN Tr. Ct., Feb. 11, 2000), aff'd SU 00-04 (HCN S.Ct., Sept. 29, 2000). And, while the plaintiffs cause of action clearly presents a constitutional concern, it also must represent a case or controversy. In other words, the matter must be justiciable.
A determination of justiciability includes an inquiry into whether the plaintiff or petitioner can appropriately claim standing. The Court has utilized federal judicial standards when performing this assessment. See e.g., Libby Fairchild v. Ho-Chunk Nation Legislature, CV 00-55 (HCN Tr. Ct., July 18, 2001) at 8; Jacob LoneTree et al. v. Robert Funmaker et al., CV 00-105 (HCN Tr. Ct., Nov. 21, 2000) at 11, aff'd on other grounds, SU 00-16 (HCN S.Ct., Mar. 16, 2001); Steve B. Funmaker v. JoAnn Jones et al., CV 97-72, 1997 WL 34671359, 1 Am. Tribal Law 223, -- (HCN Tr. Ct., Nov. 26, 1997) at 9-13; Loa L. Porter v. Chloris A. Lowe, Jr., CV 95-23 (HCN Tr. Ct., July 18, 1996) [hereinafter Porter II] at 8-10, rev’d on other grounds, SU 96-05 (HCN S.Ct., Jan. 10, 1997). The Court now takes this opportunity to closely examine federal standing precedent, the adoption of resulting *337 standards by the Court, and whether a recent decision regarding the right to petition for redress of grievances should affect the Court’s treatment of standing. See LoneTree, CV 00-105, aff'd, SU 00-16 (HCN Tr. Ct., Mar. 16, 2001).
A. Federal standing doctrine.
The United States Constitution likewise includes a Case and Controversy Clause. See U.S. Const., Art. Ill, § 2(1). As a consequence, the United States Supreme Court [hereinafter U.S. Supreme Court] has articulated standards to assist in determining whether a plaintiff has standing to initiate and maintain a suit. The core requirements emerge directly from the Case and Controversy Clause, but prudential considerations have also developed over time.
The most rudimentary constitutional standing inquiry is as follows: “whether the plaintiff has ‘alleged such a personal stake in the outcome of the controversy’ as to warrant his[/her] invocation of ... court jurisdiction and to justify exercise of the court’s remedial powers on his[7her] behalf.” Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)); see also Allen v. Wright, 468 U.S. 737, 770, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (Brennan, J., dissenting). In other words, “ ‘the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.’ ” Data Processing Serv. v. Camp, 397 U.S. 150, 151-52, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (quoting Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)). The Case and Controversy Clause does not require more in principle.
Nonetheless, the U.S. Supreme Court has elaborated upon the above principle in an effort to provide definitive constitutional requirements of standing. At an “irreducible minimum,” a plaintiff must establish the presence of certain conditions. Valley Forge Coll. v. Americans United, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Specifically, a plaintiff must “ ‘show that he|7she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,’ and that the injury ‘fairly can be traced to the challenged action’ and ‘is likely to be redressed by a favorable decisión].]’ ” Id. (internal citations omitted); see also Friends of Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Allen, 468 U.S. at 750, 104 S.Ct. 3315. For purposes of this case, the Court shall focus its sole attention upon the first element of constitutional standing since the parties do not dispute the presence of the remaining two (2) elements. Motion Hearing (Log of Proceedings Electronically Recorded [hereinafter LPER ] at 2, Nov. 8, 2001, 10:06:51 CST).
Prior to defining “injury,” the Court will identify the prudential considerations of standing which have accompanied and confounded the constitutional standard. Even the U.S. Supreme Court laments the ambiguity present in its case law, commenting that “[g]eneralizations about standing to sue are largely worthless as such.” Data Processing, 397 U.S. at 151, 90 S.Ct. 827. Other Justices have used the adjectives, “amorphous,” Flast, 392 U.S. at 99, 88 S.Ct. 1942, and “misguided,” Vallen Forge, 454 U.S. at 491, 102 S.Ct. 752 (Brennan, J., dissenting), to describe the Court’s standing jurisprudence. The vagaries in the law chiefly derive from the U.S. Supreme *338 Court’s inconsistent elevation of prudential considerations over their constitutional counterparts. The constitutional standard is purposefully broad, but “[a]dditional uncertainty exists in the doctrine of justicia-bility because that doctrine has become a blend of constitutional requirements and policy considerations.” Flast, 392 U.S. at 97, 88 S.Ct. 1942; see also Valley Forge, 454 U.S. at 471, 102 S.Ct. 752.
The wide-ranging prudential considerations have served to greater restrict access to the federal courts. First, the U.S. Supreme Court has erected a “rule of self-restraint” to protect against unduly broadening the class of individuals who may bring suit. Data Processing, 397 U.S. at 154, 90 S.Ct. 827. The U.S. Supreme Court “has held that when the asserted harm is a ‘generalized grievance’ shared in substantially equal measure by all or a large class of citizens, that harm alone does not warrant an exercise of jurisdiction.” Worth, 422 U.S. at 499, 95 S.Ct. 2197. Rather, the aggrieved citizens should seek relief from the representative branches of government, ie., executive and legislative. Allen, 468 U.S. at 751, 104 S.Ct. 3315. “Second, even when the plaintiff has alleged an injury sufficient to meet the ‘case or controversy’ requirement, th[e U.S. Supreme] Court has held that the plaintiff generally must assert hisf/her] own legal rights and interests, and cannot rest hisf/her] claim to relief on the legal rights or interests of third parties.”[1] Warth, 422 U.S. at 499, 95 S.Ct. 2197. Third, the U.S. Supreme Court requires that “the interest sought to be protected by the complainant-is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” Data Processing, 397 U.S. at 153, 90 S.Ct. 827. Courts most often confront this consideration when interpreting statutory citizen-suit provisions.
Prudential considerations aside, the Court shall redirect its attention to the constitutional standing requirement of an “actual or threatened injury.”
Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution. It adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful. This personal stake is what the [U.S. Supreme] Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his [/her] grievance. Such authoritative presentations are an integral part of the judicial process, for a court must rely on the parties’ treatment of the facts and claims before it to develop its rules of law. Only concrete injury presents the factual context within which a court, aided by parties who argue within the context, is capable of making decisions.
Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 220-21, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). A court, therefore, must begin this portion of the standing inquiry by asking “whether the plaintiff *339 alleges that the challenged action has caused him[/her] injury in fact, economic or other-wise,” Data Processing, 397 U.S. at 152, 90 S.Ct. 827.
The nature of the interest involved is not determinative of the issue of standing. However, the “injury in fact” must prove “distinct and palpable ..., even if it is an injury shared by a large class of other possible litigants.” Warth, 422 U.S. at 501, 95 S.Ct. 2197. A “court’s judgment may benefit others collaterally” so long as the plaintiff constituted a proper party. Id. at 499, 95 S.Ct. 2197. The U.S. Supreme Court has spoken adamantly on this issue, stating: “To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.” United States v. SCRAP, 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).
In this regard, the U.S. Supreme Court has found the requisite degree of constitutional injury present when confronting an alleged violation of an expansive category of interests. For example, the U.S. Supreme Court has “held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons ‘for whom the aesthetic and recreational values of the area will be lessened’ by the challenged activity.” Laidlaw, 528 U.S. at 183, 120 S.Ct. 693 (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); see also SCRAP, 412 U.S. at 686, 93 S.Ct. 2405. The interest may also derive from constitutional sources, and “need not be a monetary one. In Baker v. Carr, it was the right to vote....” Schlesinger, 418 U.S. at 234, 94 S.Ct. 2925 (Douglas, J„ dissenting); sea also Data Processing, 397 U.S. at 154, 90 S.Ct. 827. The U.S. Supreme Court has drawn its audience’s attention to “these noneconomic values to emphasize that standing may stem from them as well as from [an] economic injury. ...” Data Processing, 397 U.S. at. 154, 90 S.Ct. 827.
Essentially, if a plaintiff challenges the legality of governmental action or inaction, the plaintiff must prove that he or she is the object of such action or inaction in order to generally establish standing. Lujan, 504 U.S. at 561, 112 S.Ct. 2130. “if he[7she] is, there is ordinarily little question that the action or inaction has caused him[/her] injury, and that a judgment preventing or requiring the action will redress it.” Id. at 561-62, 112 S.Ct. 2130. Doubt enters into the equation as a result of the extra-constitutional prudential considerations. The Court shall later address the validity of importing these judicially created policies into our context,
B. Tribal standing jurisprudence.
In 1996, the Court, former Chief Judge Mark Butterfield presiding, adopted the constitutional standing requirements as articulated in Valley Forge. Loa. L. Porter v. Chloris A. Lowe, Jr., CV 95-23 (HCN Tr. Ct, Mar. 1, 1996) at 3; see supra at 10. By virtue of a subsequent recusal and a request to reconsider, the Court, former Associate Judge Joan Greendeer-Lee presiding, expanded upon the minimal constitutional standing requirements, incorporating the first two (2) prudential considerations. Porter II at 8-9; see supra, at 11. The Court took this action -without any apparent appreciation of the distinction between the constitutional requisites and judicial policy determinations. Id. Yet, the intermixing of considerations proved inconsequential since the Court, declined to reverse the earlier finding of standing. Id. at 12,
*340 Moreover, the Court is not compelled to apply the prudential considerations because the Supreme Court of the Ho-Chunk Nation [hereinafter HCN Supreme Court] did not squarely address the elements of standing in the Porter appeal.[2] Porter, SU 96-05 (HCN S.Ct., Jan. 10, 1997) [hereinafter Porter III ]. Instead, the HCN Supreme Court simply ruled that the plaintiff “did not have standing to bring this action as an individual.” Id. at 2. The HCN Supreme Court reasoned that the Ho-Chunk Nation Legislature [hereinafter Legislature] represented the sole entity that could employ corrective measures to remedy an alleged misuse of delegated legislative powers.[3] Id. at 2-3.
Concerning the plaintiffs related employment grievances in Porter, the HCN Supreme Court held that the plaintiff “d[id] not have standing to bring a lawsuit on a personnel matter where she has not initially followed the legislatively enacted administrative process of the Ho-Chunk Nation Personnel Policies and Procedures.” Id. at 4. However, a failure to exhaust administrative remedies does not merit a determination of a lack of standing to sue, but rather a lack of ripeness holding. , The appellate decision mostly involves discussion on the issue of ripeness and not standing. Id. at 4-6.
The Court has directly addressed standing in three (3) other cases. First, in *341 Funmaker; the Court began by appropriately setting forth the minimum constitutional standing requirements. Funmaker at 9 (quoting Valley Forge, 454 U.S. at 472, 102 S.Ct. 752). The Court proceeded to quote the HCN R. Civ. P. for the proposition that “ ‘[e]very action shall be brought in the name of the real party in interest],]’ ” as somehow determinative of the issue in some respect. Funmaker at 9 (quoting HCN R, Civ. P. 23). In actuality, this rule only selves to partially restate the first element of the constitutional standing inquiry.
More importantly, the Court went on to discuss the underpinnings of citizen and/or taxpayer standing precedent, emphasizing the prudential consideration that a court should decline to hear generalized grievances brought by an individual alleging only an abstract injury shared by a multitude of other similarly-situated citizens or taxpayers. Funmaker at 10-11; see supra at 11. The Court, however, did not need to conduct this discussion due to the plaintiffs inability to satisfy the first and third elements of the constitutional standing test. The “plaintiff admitted] that he enjoy[ed] no personal stake in the disputed funds ...and could not “articulate] ] how money damages paid to the Nation would redress his injury.... ” Funmaker at 10. Therefore, the Court refrains from proliferating the aforementioned dicta, and shall thoroughly discuss the appropriateness of adopting the federal prudential considerations below.
Second, the Court made a cursory judgment relating to standing in LoneTree. Without specifically restating the constitutional standard, the Court held that the plaintiffs had not suffered an actual injury. LoneTree at 11. The plaintiffs, District V members, attempted to assert an interest arguably held by District I members. Id. The plaintiffs accordingly failed to satisfy the first element of the minimum constitutional standing inquiry. “]N]one of them ha[d] the requisite concrete injury in fact that [was] likely to be redressed ...” by a favorable judicial decision. Id.
Third, in Fairchild,, the Court rested part of its holding on the fact that the Court could not provide a remedy for the injury, Fatrchild at 8. The plaintiff sought a money judgment against the Legislature, but could not point to an applicable waiver of sovereign immunity from suit. Id. Therefore, the plaintiff could not satisfy the third element of the minimum constitutional standing inquiry.
The Court then proceeded to address the plaintiff’s claim that the President should exercise check signing authority and not the Legislature. Id. at 8-9. Once again, the Court seemingly utilized the first two prudential considerations in arriving at its decision. Id. The Court found “that the plaintiff, as an employee and/or as a member, suffer[edj no particularized injury as compared to any other employee and/or member.” Id. at 8. This finding appears to evidence some reliance upon the admonition against generalized grievances. Also, the Court found “that th[e] marginally affected plaintiff' may not, attempt to vindicate the rights/interests of the President of the Ho-Chunk Nation.” Id. at 9 (emphasis added). This finding cautions against the assertion of the legal interests of a third party.[4]
In retrospect, the Court could and should have rested its holding squarely on the plaintiffs failure to satisfy the first element of the constitutional standing inquiry. The plaintiff sued to compel a reimbursement allegedly withheld without *342 justification. Id. at 6-7. A former designated legislative signatory refused to sign the plaintiff s reimbursement check. Id. at 7. The former legislator could not ascertain any legal basis supporting the reimbursement. Id. The plaintiff, therefore, objected to the .legislator’s application of the law.
The decision to deny reimbursement did not stem from the purported improper exercise of constitutional authority. If the plaintiff would have received reimbursement, then the plaintiff would have suffered no actual harm. Yet, the former legislator still would have hypothetically signed the check. The alleged misapplication of policy, and not the alleged unconstitutional infringement, produced the harm sustained by the plaintiff. Certainly, the former legislator would not have occupied a position to render the policy determination absent his possession of signature authority, but the Court cannot ably foresee that the President would have rendered a different decision. The plaintiff challenged the legislative exercise of check signing authority, and quite simply failed to allege an “injury as a result of the putatively illegal conduct of the defendant.” Valley Forge, 454 U.S. at 472, 102 S.Ct. 752 (emphasis added).
The Court’s case law demonstrates a consistent application of the minimum constitutional standing inquiry. Regretfully, prudential considerations have unnecessarily crept into the jurisprudence without any meaningful discussion as to why. The Ho-Chunk Nation Judiciary should not automatically incorporate the prudential considerations of the federal court system. These types of policy determinations will obviously differ depending on the context, and the Court will further analyze this issue below.
C. Petition for redress of grievances.
In 2000, the Court decided a case that presented the following issue: Does an individual tribal member independently possess the constitutional authority to serve a Notice of Intent to Remove upon a sitting President? LoneTree, CV 00-105 (HCN Tr. Ct., Dec. 7, 2000), aff'd, SU 00-16 (HCN S.Ct., Mar. 16, 2001). The Court held that denying an individual’s ability to serve a Notice of Intent to Remove “would ... violate a member’s right pursuant to Art. X, § 1(a)(1) to petition their government for redress of grievances.” Lone-Tree, CV 00-105 at 9. Therefore, the plaintiff could properly present the allegations for removal contained in the Notice of Intent to Remove to the Ho-Chunk Nation General Council.
Admittedly, this holding denotes a rather expansive interpretation of the right to petition for redress of grievances. Yet, individuals have historically exercised this right freely with the imposition of only minimal restraint. See Adderley v. Florida, 385 U.S. 39, 49 n. 2, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (Douglas, J., dissenting). The U.S. Supreme Court explained that
“[t]he very idea of a government, republican in form, implies a right on the part of its citizens ... to petition for a redress of grievances.” ... For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions....
De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937) (quoting United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588 (1875)); see also Mine Workers v. Ill, Bar Ass’n, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). In the context of the judiciary, an individual exercises the right to petition for redress of grievances through the filing of a *343 complaint. McDonald v. Smith, 472 U.S. 479, 484, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985).
Consequently, the question becomes whether a plaintiff should automatically have standing to sue in light of the LoneTree decisions. The answer is undeniably “no.” The Court will draw an analogy to illustrate this decision.
A member may seek an action of the General Council by presenting an item for discussion and debate through a motion made on the floor. Typically, another member must second the motion prior to its inclusion on the agenda. The motion, however, may die for lack of a second. Similarly, the Genera] Council may decline to hear the merits of the item on the grounds that it falls outside its constitutional purview or for an unstated reason. The individual nonetheless exercised his or her right to petition for redress of grievances. The ability to petition does not guarantee subsequent consideration or determination. A plaintiff likewise may file a complaint, but the Court may decline to hear the matter after performing the necessary inquiries relating to jurisdiction and justicia-bility.
D. Standing in the case at bar.
Both parties present their arguments on standing by reference to and reliance upon the minimum constitutional standing inquiry. See e.g., Defendants’ Brief in Support of a Motion for Summary Judgment [hereinafter Legal Memorandum ], CV 01-84 (Oct. 26, 2001) at 9-12. And, as noted above, the parties only dispute the first element of the standing inquiry. See supra, at 10. The defendants’ principal contention is that the plaintiff lacks standing because he has not suffered an actual or threatened injury to a constitutionally protected liberty or property interest. Motion Hearing (LPER at 2, Nov. 8, 2001, 10:07:34 CST). The defendants cited U.S. Supreme Court case law for the proposition that standing hinged on the presence of an affected liberty or property interest. Id. at 2, 10:11:05 CST.
The Court reviewed each of the opinions cited by the defendants, and discovered no mention of the terms liberty interest or property interest. See Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). Concededly, the cases do concern issues of liberty and property, but the U.S. Supreme Court did not incorporate concepts commonly associated with minimum procedural due process into its standing jurisprudence. See e.g., Roy J. Rhode v. Ona M. Garvin, as Gen. Manager of Rainbow Casino, CV 00-39 (HCN Tr. Ct., Aug. 24, 2001) at 16-20. The standing determinations in each case simply do not rest upon the petitioners’ articulation of either a liberty or property interest.
In Bennett, the U.S. Supreme Court needed to decide “whether the petitioners, who have competing economic and other interests in the Klamath Project water, have standing to seek judicial review of the biological opinion under the citizen-suit provision of the [Endangered Species Act of 1973(ESA)1, § 1540(g)(1), and the Administrative Procedure Act (ASA), 80 Stat. 392, as amended, 5 U.S.C. § 701 et seq.” Bennett, 520 U.S. at 157, 117 S.Ct. 1154. The petitioners alleged that the Secretary of the Interior and the Fish and Wildlife Service violated the ESA through premature actions intended to preserve the environment of the endangered Lost River and Shortnose Suckers. Id. at 157-60. The resulting decision primarily focused upon the application of the zone of interests prudential consideration, due to the presence of the citizen-suit provisions.
*344 For example, the ESA citizen-suit provision conferred standing upon an exceedingly broad class through use of the following language: “ ‘any person may commence a civil suit....”’ Id. at 164, 117 S.Ct. 1154 (citing 16 U.S.C, § 1540(g)). In turn, the Bennett Court literally interpreted this provision due to two (2) interrelated considerations: “that the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the particular provision in question is to encourage enforcement by so-called ‘private attorneys general....’” Bennett, 520 U.S. at 165, 117 S.Ct. 1154. Thus, even when discussing the citizen-suit provision, the U.S. Supreme Court emphasized the presence of an interest, environmental, typically capable of sustaining a claim of standing. This stands in stark contrast to the contention of the defendants that standing can only derive from an affected liberty or property interest.
Obviously, this discussion proves largely immaterial to the facts: currently under consideration. The plaintiff has not brought his cause of action under a citizen-suit provision. The Bennett Court, however, did alternatively assess the merits of the petitioners’ claims under the minimum constitutional standing inquiry, but, as noted above, this inquiry does not erect limitations concerning the type of interest properly alleged in a pleading. Id. at 167-68, 117 S.Ct. 1154.
In Whitmore, the U.S. Supreme Court confronted the following issue: “whether a third party has standing to challenge the validity : of a death sentence imposed on a capital defendant who has elected to forgo his right to appeal to the State Supreme Court,” Whitmore, 495 U.S. at 151, 110 S.Ct. 1717. For this reason, this case bears even less similarity to the case at bar since it mostly revolves around the contemporary application of the “next friend” representation concept. Id. at 161-66, 110 S.Ct. 1717. The petitioner, a death row inmate, sought to intervene on the behalf of a fellow death row inmate, Ronald Gene Simmons, who voluntarily opted to forego an appeal of his execution sentence for murdering fourteen (14) family members. Id. at 151-53, 110 S.Ct. 1717.
The petitioner asserted an interest in the Arkansas Supreme Court entertaining an appeal since the State conducted a comparative review of death penalty cases in meting out its sentences. Id. at 156, 110 S.Ct. 1717. The petitioner constructed an unlikely chain of events in support of his standing assertion.
Although he ha[d] already been convicted of murder and sentenced to death, ha[d] exhausted his direct appellate review, and ha[d] been denied state post-conviction relief, petitioner suggested] that he might in the future obtain federal habeas corpus relief that would entitle him to a new trial. If, in that new trial, Whitmore is again convicted and sentenced to death, he would once more seek review of the sentence by the Supreme Court of Arkansas; that court would compare Whitmore’s case with other capital cases to insure that the death penalty is not freakishly or arbitrarily applied in Arkansas.
Id. (internal citations omitted). In contrast, the plaintiff in the instant case seeks to determine whether certain constitutional provisions should have secured his designation as Vice President.
The U.S. Supreme Court again applied the minimum constitutional standing inquiry to the facts and circumstances in Whit-more, determining that the petitioner could not plausibly show an actual or threatened injury on the basis of the above *345 attenuated line of causation. Id. at 155-60, 110 S.Ct. 1717. Therefore, the petitioner failed to satisfy the first element of the constitutional standing inquiry. In arriving at this conclusion, the Whitmore Court distinguished case precedent, in particular SCRAP, where “the environmental group alleged that specific and perceptible harms—depletion of natural resources and increased littering—would- befall its members imminently....” Id. at 159, 110 S.Ct. 1717 (citing SCRAP, 412 U.S. at 688-90, 93 S.Ct. 2405). Importantly, neither of these potential injuries directly implicates a liberty or property interest.
As previously indicated, Whitmore attempted to intervene by identifying himself as “next friend” of the convicted mass murderer. “A ‘next friend’ does not him[/her]self become a party to the habeas corpus action in which he[/she] participates, but simply pursues the cause on behalf of the detained person, who remains the real party in interest.” Whitmore, 495 U.S. at 163, 110 S.Ct. 1717. Because of this fact and in light of the preceding discussion, the Court does not understand why the defendants would direct the Court’s attention to Whitmore.
In sum, the defendants have cited cases incapable of substantiating the proposition that a plaintiff must suffer an injury to either a liberty or property interest in order to possess standing to initiate a suit. Instead, the decisions reflect sound reliance upon the minimum constitutional standing inquiry. The U.S. Supreme Court judged whether the petitioners alleged an injury in fact to a cognizable interest by performing the analysis associated with the first element of the standing inquiry. The Court shall perform that same analysis upon the injury asserted in the present case.
The plaintiff essentially alleges that he has suffered a constitutional injury resulting from the passage of HCN LEG. RES. 07/03/01 G.[5] Consequently, the plaintiffs previously existing scope of authorities and responsibilities decreased after his removal from the Vice Presidency. See e.g., Constitution, Art. V, § 1(c); Legislative Organization Act of 2001, 2 HCC § 11(7). For purposes of standing, the Court only inquires whether the plaintiff “suffered a particular injury caused by the action challenged as unlawful.” Schlesinger, 418 U.S. at 221, 94 S.Ct. 2925. The plaintiff clearly satisfies this simple standing requirement. The Court would stand alone if it declined to recognize the potential for harming constitutional interests. See supra at 13. Moreover, the plaintiff was the direct object of the governmental action, thereby assuring him the requisite injury and resulting standing. See Lujan, 504 U.S. at 561-62, 112 S.Ct. 2130.
The related prudential limitations against hearing generalized grievances and legal interests asserted by third parties are not directly relevant here. Likewise, the Court’s above discussion regarding the zone of interests limitation reveals its lack of relevance to the case at bar. However, the Court will address the two (2) related prudential limitations to avoid any future intermingling with the minimum constitutional standing inquiry. The Court must illuminate the distinguishing features to insure the clarity of the Nation’s standing jurisprudence.
In 1879, the U.S. Supreme Court acknowledged state court practice of permit *346 ting a county taxpayer to sue the officers of a municipal corporation. Crompton v. Zabriskie, 101 U.S. 601, 609, 25 L.Ed. 1070 (1879). In adopting this stance, the Crompton Court noted that “there would seem to be no substantial reason why a bill by or on behalf of individual tax-payers should not be entertained to prevent the misuse of corporate powers.” Id. The U.S. Supreme Court, however, declined to extend this reasoning to encompass actions brought by federal taxpayers against the federal government. See Frothingham v. Mellon, 262 U.S. 447, 486-89, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).
The Frothingham Court distinguished the state municipal standing cases in the following manner:
[T]he relation of a taxpayer of the United States to the Federal Government is very different. Hisl/her] interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventative powers of a court of equity.
Id, at 487, 43 S.Ct. 597. The U.S. Supreme Court wished to avoid becoming inundated with cases brought by litigants alleging “matterfs] of public and not of individual concern.” Id, The U.S. Supreme Court sharply criticized the potentiality of basing standing upon a harm “sufferfed] in some indefinite way in common with people generallyf,]” but this very critique has not escaped its fair share of criticism. Id. at 488, 43 S.Ct. 597.
The U.S. Supreme Court later acknowledged the extra-constitutional bases of its taxpayer standing doctrine, remarking that the petitioner in Frothingham perhaps lacked standing to sue simply “because her tax bill was not large enough.” Flast, 392 U.S. at 93, 88 S.Ct. 1942. The Flash Court then wondered whether á wealthier taxpayer could overcome the prudential limitations since he or she could assert a greater stake in federal governance. Id. at 94, 88 S.Ct. 1942. The U.S. Supreme Court continued by indicating that the present ability of constructing class actions and joining parties significantly allays the fear of a vastly increased caseload.[6] Id.
Ultimately, “Frothingham’s reasoning remains obscure.” Valley Forge, 454 U.S. at 496, 102 S.Ct. 752 (Brennan, J., dissenting). The prudential limitations against hearing generalized grievances and legal interests asserted by third parties emerged from this obscurity although directly contrary to the sound, and equally germane, reasoning of Crampton. Id. at 498, 102 S.Ct. 752. After all, “[t]he only distinction that a Constitution guaranteeing justice to all can recognize is one between some injury and none at all.” Id, at 496, 102 S.Ct. 752. Former Justice William J. Brennan nevertheless conceded that “it is sufficient for present purposes to say that Frothingham held that the federal taxpayer. has no continuing legal interest in the affairs of the Treasury analogous to a shareholder’s continuing interest in the conduct of a corporation.” Id. at 499, 102 S.Ct. 752.
The preceding discussion should adequately demonstrate the dissimilarity between the federal and tribal contexts in relation to the fust two (2) prudential considerations. The level of a tribal member’s association with or detachment from *347 his or her government more appropriately equates with that of a municipal taxpayer based solely upon population, not to mention the interrelatedness of the membership. The United States population is approximated currently at 287,042,374. http:// www.census.gov/cgi-bin/popclock (last visited May 14, 2002) (on file with the U.S. Census Bureau, Population Div.). In comparison, the population of the Ho-Chunk Nation was recently designated as 6,151. HCN Leg. Res. 04/03/02 B. Essentially, the reasoning supporting the Frothing ham decision is wholly irrelevant and inapposite. Therefore, the Court deems an importation of the noted federal prudential considerations both improper and unnecessary. Furthermore, the Court would avoid confusion by focusing solely upon the minimum constitutional standing inquiry, which, in most instances, will yield the same results. See supra at 341—42.
In conclusion, the Court holds that the plaintiff maintains standing in the present case. The plaintiff alleges a constitutional injury, and represents the most logical party to seek redress for the associated harm. No requirement exists in the law that a plaintiff show injury to either a liberty or property interest to properly claim standing, and the Court will decline the defendants’ invitation to erect such a requirement today.
II. Does the Constitution preserve a Legislator’s designation as Vice President throughout such member’s four-year term regardless of whether the Vice President momentarily ascends to the position of ('resident pro tempore?
The General Council’s removal of President Jacob LoneTree on October 21, 2000 triggered certain constitutional provisions pertaining to a vacancy in the Office of the President. See Constitution, Art. IX, § 9(b). The Constitution requires the Vice President to assume the position of President -pro tempore until the administration of the Oath of Office to a successor President-elect. Id. Significantly, “[u]pon election of a President at the next General Election, the Vice President shall reas-sume his seat on the Legislature for the remainder of his term, if any.” Id. (emphasis added). Throughout the relevant section, the Constitution repeatedly refers to the President pro tempore as the Vice President. Id., Art. IX, § 9. The supreme law explicitly depicts “[a] Vice President serving in the capacity of President pro tempore....” Id., Art. IX, § 9(d).
A plain interpretation of the Constitution reveals that a legislator’s designation as Vice President remains fully intact throughout his or her service as President pm tempore. More importantly, a Vice President is entitled to retain that designation upon his or her return to the Legislature. The parties do not dispute that “[m]embers of the Legislature ... serve four (4) year terms ...,” nor do they dispute that the plaintiff is completing his term which began shortly after the June 1999 General Election. Id., Art. V, § 6. Given these facts, the defendants cannot support the plaintiffs removal from the Vice President position because “[t]he Legislature ... seleetfs] from among its Members a Vice President to serve throughout such Member’s term.” Id., Art. V, § 1(c) (emphasis added).
The defendants did not directly address the preceding constitutional provisions in the Legal Memorandum, but made a later suggestion as to their interplay. See Defendants’ Brief in Reply [sir/ to Plaintiffs Motion for Summary .ludgment [hereinafter Defendants’ Response ], CV 01-84 (Nov. 2, 2001) at 2-3. The defendants focused on the requirement to “call a Special Election in the appropriate District *348 within thirty (30) days to fill the seat vacated by the Vice President.” Id., Akt. IX, § 9(b). On the basis of this single sentence, the defendants concluded that “a plain reading of the {sic ] Article IX Section 9 Indicates that the Vice President vacates the Vice President position upon ascending to the office of the President as the President pro tempore.” Defendants’ Response at 2-3. Obviously, the defendants ignore the subsequent sentence emphasized above by the Court, namely: “Upon election of a President ..., the Vice President shall reassume his seat on the Legislature....”[7] Constitution, Art. IX, § 9(b). Also, the defendants fail to distinguish a legislative seat vacated by the Vice President from the position of the Vice President.
The defendants refer to another section of the constitution to bolster the argument that the Legislature must name a replacement Vice President once a legislator becomes President pro tempore. See Defendants’ Respmise at 3. Specifically, “[i]f a vacancy occurs in the Legislature ... for any ... reason, such vacancy shall be filled.... ” Constitution, Art. IX, § 10. Section 10 continues by setting forth the relevant election timelines. Id. Therefore, this section addresses vacancies of legislative seats, and not of officially designated positions obtained by virtue of occupying a legislative seat. The membership does not elect a replacement Vice President any more than they elect replacement legislative subcommittee presiding officers. The voters elect an individual to fill a vacated legislative seat, nothing more. In this instance, the voters elected former Legislator Robei't A. Mudd to fill the vacated legislative seat, but Legislator Mudd did not fill the Vice President position as a result of his Special Election win.
The defendants, however, chose to ignore the integral election component of the legislative vacancy provisions. In doing so, the defendants attempted to gain a justification for their unconstitutional action. The defendants assert that they passed HCN Leg, Res. 07/03/01 G by authority of Section 10, but this contention clearly holds no credibility. Defendants’ Response at 3. The defendants certainly possess the authority to designate an individual to perform a Vice President’s duties during an absence, but cannot appoint a replacement Vice President during such member’s term of office.[8] See Constitution, Art. V, § 2(g).
BASED UPON THE FOREGOING, the Court declares HCN Leg. Res. 07/03/01 G unconstitutional, and directs the defendants to return the plaintiff to the position of Vice President effective immediately.[9] The Court enters this relief pur *349 suant to its broad remedial authority. See Constitution, Art. VII, § 6(a-b); see also HCN R. Civ. P. 53.
The parties retain the right to file a timely post judgment motion with this Court in accordance with HCN R. Civ. P. 58, Amendment to or Relief from Judgement or Order. Otherwise, “[a]ny final Judgement or Order of the Trial Court may be appealed to the HCN Supreme Court.[10] The Appeal must comply with the Ho-Chunk Nation Rules of Appellate Procedure [hereinafter HCN R.App. P.], specifically [HCN R.App. P.], Rule 7, Right of Appear HCN R. Civ. P. 61. The appellant “shall within thirty (30) calendar days after the day such judgment or order was rendered, file with the [HCN Supreme Court] Clerk of Court, a Notice of Appeal from such judgment or order, together with a filing fee of thirty-five dollars ($35 U.S.).” HCN R,App. P. 7(b)(1). “All subsequent actions of a final Judgement or Trial Court Order must follow the [HCN R.App. P.].” HCN R. Civ. P. 61.

. However,
[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization’s purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
Laidlaw, 528 U.S. at 181, 120 S.Ct. 693 (citing Lujan, 504 U.S. at 563, 112 S.Ct. 2130).

. The HCN Supreme Court recently clarified that ”[w|hile the trial court should try to remain consistent in its decisions, only decisions by th(e HCN Supreme Court] are limitations on the Trial Court.” LoneTree, SU 00-16 at 4.

. By this ruling, the HCN Supreme Court may have implicitly adopted the prudential admonition that one cannot base a cause of action upon the legal interests or rights of a third party. This premise represents a prudential consideration since “legal interests” are distinguishable from “interests” encountered in a strictly constitutional standing inquiry. See Data Processing, 397 U.S. at 152-53, 90 S.Ct. 827. The Court shall later address the possible incorporation of this policy into its standing jurisprudence, but, at this time, respectfully questions whether the President abused legislatively delegated authority in Porter. Essentially, the President acted to restructure Administrative Departments created by the Legislature, merging the Departments of Health and Social Services into a single entity. See Constitution, Art, VI, § 1 (b). The HCN Supreme Court characterized these executive actions as a performance of delegated legislative functions, stating:
The Legislature has reserved their power to deal with such actions by the Executive Branch as stated in the Ho-Chunk Nation Constitution at Article V, Section 2, subsection (b), to wit, “the Legislature reserves the power to review any action taken by virtue of such delegated power.” The delegated power being the power of the Executive Branch to administer departments of the Ho-Chunk Nation.
Porter III at 2 (quoting Constitution. Art. V, § 2(b)). The Court cannot concur with the HCN Supreme Court since the President independently possesses "the power to administer all Departments, boards, and committees created by the Legislature,” Constitution, Art. VI, § 2(d). The Legislature may certainly delegate legislative powers to the President, id., Art. VI, § 2(1), but no such delegation occurred in Porter. The Legislature should not hold the power to review any and all administrative decisions by virtue of its power to establish administrative departments. In Porter, the President merely acted outside the scope of his constitutional authority by usurping a legislative function. Furthermore, the HCN Supreme Court does not affirmatively state that the Legislature could have sought judicial redress, but indicated that "redress would seem to be in the form of legislative measures which are not within the powers of the judiciary branch.” Porter III at 3. Due to this statement, the Court remains unclear as to whether a prudential consideration has entered our case law and whether the Court may safely resolve constitutional disputes between the Legislative and Executive Branches. But see e.g.. President Pro Tempore Clarence Pettibone v. Robert Mudd et al., CV 01-17 (HCN Tr. Cl., May 16, 2001).

. The Court deliberately refrained from using mandatory language due to the uncertainty arising from the earlier HCN Supreme Court ruling. See supra note 3, at 14-15.

. The plaintiff also alleged a diminished level of respect and increased uncertainty amongst the membership arising from the actions of the Legislature. Motion Hearing (LPER at 2, Nov. 8, 2001, 10:02:21 CST). The plaintiff, however, presented no testimony from members of his constituency to.substantiate this additional harm. Id. at 2, 10:04:32 CST.

. The HCN Supreme Court recently amended the HCN R. Civ. P. to include Rule 9 addressing class action lawsuits. See also HCN R. Civ. P, 24.

. When the Court asked defendants’ counsel how to reconcile Art. V, § 1(c) and Art. 9, § 9(b) at the Motion Hearing, counsel could only respond by stating, “perhaps they are inconsistent,” Motion Hearing (LPER at 5, Nov. 8, 2001. 10:32:54 CSTl.

. The constitutional drafters may have intended to incorporate an element of continuity into the legislative branch framework by requiring the retention of a Vice President. Nonetheless, the Court appreciates the reasoning behind permitting a newly constituted legislative body to select its own Vice President following a General Election. In order to affect this type of change, the Legislature must seek a constitutional amendment.

.Bv this ruling, the Court makes no qualitative determinations as to the performance or competency of either Clarence Pettibone or Wade Blackdeer. The Court's decision rests solely Upon the proper application of law to a given set of facts and circumstances. The Court recognizes the political ramifications of this ruling, “[b]ut courts cannot refuse to hear [or decidej a case on the merits merely because thev would prefer not to....” Warth, 422 Ü.S. at 520, 95 S.Ct. 2197 (Brennan, J„ dissenting).

. The HCN Supreme Court earlier emphasized that it “is not bound by the federal or state laws as to standards of review.” Louella A. Kelty v. Jonette Pettibone and Ann Winneshiek, in their official capacities, SU 99-02 (HCN S.Ct., Sept. 24, 1999) at 2. The HCN Supreme Court, therefore, has voluntarily adopted an abuse of discretion standard “to determine if an error of law was made by the lower court.” Daniel Youngthunder, Sr. v. Jonette Pettibone, Ann Winneshiek, Ona Garvin, Rainbow Casino Mgmt., SU 00-05 (HCN S.Ct., July 28, 2000) at 2; see also Coalition for a Fair Gov’t II v. Chloris A. Lowe, Jr. and Kathyleen Lone Tree-Whiterabbit, SU 96-02 (HCN S.Ct., July 1, 1996) at 7-8; and JoAnn Jones v. Ho-Chunk Nation Election Bd. and Chloris Lowe, CV 95-05 (HCN S.Ct., Aug. 15, 1995) at 3. The HCN Supreme Court accepted the following definition of abuse of discretion: “any unreasonable, unconscionable and arbitrary action taken without proper consideration of facts and law pertaining to the matter submitted.” Youngthunder, Sr., SU 00-05 at 2 (quoting Black’s Law Dictionary 11 (6th ed.1990)). Regarding findings of fact, the HCN Supreme Court has required an appellant to “demonstrate! j clear error , with respect to the factual findings of the trial court.” Coalition II, SU 96-02 at 8; but see Anna Rae Funmaker v. Kathryn Doornbos, SU 96-12 (HCN S.Ct., Mar. 25, 1997) at 1-2.